1-24-2323 WC Joanna Godlewska, appellant by Thomas Lickton v. Illinois Workers' Compensation Comm'n et al., North Shore University Health System, Appalee, by Christopher Jarko. Council Licton, you may proceed, although we don't, yes, there we are, I'm in the gallery view. Thank you. Yes, Council Licton, you may proceed. Thank you, Your Honor. My name is Tom Licton. I'm the attorney for the appellant, Joanna Godlewska. I'm confident that if the court looks at the actual facts of the case, it will agree with my position that the arbitrator, the arbitrator's decision was correct on the facts, and pretty much on the law with the exception of the temporary partial disability benefits that were awarded being changed to maintenance benefits, the 482 weeks of maintenance benefits rather than temporary partial disability benefits. And also, I can't quarrel too much with the dissenting Commissioner's suggestion, or maybe more than a suggestion, that the additional vocational rehabilitation after the petitioner became a registered nurse and able to work as a registered nurse might not have to be the respondent's responsibility, which would mean $20,000 of additional vocational rehabilitation expenses wouldn't be included. The case is really quite a simple case in my mind. If you look at the actual facts, as opposed to... Council Licton? Hello? Excuse me? Yes, you're frozen. Your video is frozen. Yes. And Justice Barberos asked you a question, and either you didn't hear it or not responding to it. Right. You were frozen at that point, so I was just asking whether or not you were conceding that portion of this case. With regard to the $20,000 for the vocational rehabilitation expenses related to becoming a practitioner? Yes. Yes, I'm willing to concede that because our, excuse me, the dissenting Commissioner, he suggested that, and I can't, you know, if you're looking at it, whether that would be against the manifest way to the evidence, I can't say that it would be. I can understand because though she couldn't really do the emergency room nurse work at that trauma at the Northwestern Trauma Center, I think there are other registered nurse jobs that would be less physically demanding, would have been less physically demanding that she could have done. Although my expert, my vocational expert supports included, and I don't think there's anything really to counter that. But let me just say what I'm saying is wrong with what the Commission did primarily is they misstated or misinterpreted. I think it's really a misstatement of what the medical evidence is. The injury was due to the practitioner, the plaintiff, the appellant having to work in a very cramped and I think it would was called by the response on consultant on economic conditions in her work as a cancer, breast cancer research scientist working in a hood that was cut down to half the size of what it was supposed to be in a job that required her presence seven days a week, at least eight, if not more than that hours a day doing the working with the cultures and the petri dishes and very delicate work that had to be done very carefully. And because of the way the workstation was set up, she did not have room to maneuver properly. And as a result, over a period of about a year, working there, trying to perform her duties, trying very hard to perform her duties, I might say, developed a herniated disc in the neck at C5-6 and also either a herniated disc or a significantly bulging disc in her thoracic spine. And this is somebody who had already worked in Poland as a cancer researcher and published several papers. She had several advanced degrees, PhD, and this was going to be her career doing this work. In fact, the letter that the university sent her when they gave her the postdoc fellowship said that they hope that she would have a good career at Northwestern. So the problem was that she eventually got to the point where she couldn't perform the work. And she, if you read the record, she sent a number of emails to her boss, Dr. Lupu, apologizing, but she just, the pain had gotten to the point where she couldn't do it. She was seen in the employee health service actually by Dr. Dowling, and he expressed a lot of concern that, in fact, if I'm going to quote, I would quote him, that she would need to have work close to, as close to her as possible within the hood and not having to reach excessively. And he said, I'm not sure ergonomically how her job situation can be adjusted. He recommended that they worked on it. The university brought in Alice Bienemann, who looked at the situation and she pretty much agreed that what needed to be done at least to hopefully solve the problem would be to have her have a hood all to herself. But this wasn't something that Alice Bienemann could decide or could control because Dr. Lupu was in charge of the lab. They suggested that an ergonomic assessment with Ted Hogan, their ergonomic consultant be done, but it was never done. So, and then she was off work. Dr. Dowling referred her to orthopedic surgeon, Dr. Shapiro, who recommended physical therapy, which made her worse. What made her better was basically not working. If you look at Dr. Shapiro's records, she gradually got better and not working. And also with taking steroids, which is an anti-inflammatory, a leave similar type of thing, pain medication, and no activity basically, and stopped the physical therapy. So after about three months, her symptoms reduced significantly, but during that period of time, the employer had fired her. And again, the court has a question for you. Justice Taylor a while back was asking you a question and there must be something wrong with your feed that you can't hear us from the bench when we have a is there, is there something wrong that you can't hear us? I can hear you now. I guess it must've just been a temporary, I don't know, glitch or something. Okay. Let's stop right there. Justice Taylor has a question for you. Mr. Lickton, I'm trying to understand the condition that your client suffered from. Is it your position that had your client had the entire hood to herself, that she would not have suffered these injuries for which she's seeking compensation? Probably not. Although we don't know what was the suggestion of, of Dr. Dowling, I believe it was Dr. Dowling was that maybe she could still work, do this research if she could have an entire hood to herself, because it wouldn't put as much stress on her neck and her upper back. And maybe this. Well, so that's what I'm trying to understand. What is it about having that answers your question? I'm trying to understand. I think, I think what Dr. Chamel said. I think there's a follow-up question, counsel, that you're not hearing from Justice Taylor. So the follow-up question is. I apologize. That's okay. My follow-up question is this. If I understand the setting, she's working under a she needs to reach into the hood with her hands, but her face can't go beyond the glass that's in front of her. So what is it about going to the left or to the right? That's going to ease the, the ergonomic position that she's in. Well, I, I am, let's say I'm somewhat skeptical that it would have helped, but this was the suggestion of Dr. Dowling. And I think of Alice Beneman that this might allow her to keep on working. Dr. Chamel said that based on his meeting with, with her and examination and reviewing all the records that he did not think she could continue working in the same or similar work situation. So whether the, you know, I, I can't, I think the idea was that if she had a completely full or normal, I guess I could say hood, it would allow her to maybe have less have to reach last strain last, and that that would allow her to keep working. The pain would be, would be tolerable, whether that would have worked or not. We'll never know because the employer chose to fire her before it ever got to that point before their ergonomic expert ever got to look at the situation and maybe tried to get Dr. Lupu to change the work situation. So, and I'd like to point out also that the commission in this decision completely ignores the fact that the employer fired my client while she was off work. And so we'll never be able to find that out. And I think that firing was an admission that she was not able to meet the, or at least the physical requirements of her post-doctoral fellowship. And so then she, I mean, without being somebody who knew anything about workers' comp law or vocational rehabilitation or anything like that, she did just what the, as my expert, Susan Nettenberg testified, what the requirements of the national T case involve, which is trying to find similar work that would utilize her considerable expertise in the field. And also when that didn't work out, then she looked to, you know, what kind of education could she get that would allow her to return to work and not have a permanent loss of income and not waste all of her previous education and expertise that she had built up. So the commission's discounting what Susan Nettenberg said is incorrect because the commission used a claim that none of the doctors were still saying that she was limited by her injuries and limited by the work station that she had to work in, which wasn't the case. And Dr. Shapiro, a commission says, well, he released her with no restrictions. If you look at what Dr. Shapiro said, well, he said, well, the physical therapy made her worse than not being not working just for a couple of months that made her better. And all he said, he didn't say anything about restrictions or not. He wasn't even really thinking about that. He was just saying, well, okay, she's gotten to the point where the pain is a lot less. So I don't need to see her again, unless the pain recurs. So the basic premise that the commission used was incorrect, that the medical, all the medical treaters said that she wasn't, that she could have gone back to her job, which nobody ever said that. And Dr. Chamel very correctly stated that this is just a job that she can't work in anymore. It's the same or similar and the commission couldn't find any other position except going to school and utilizing her knowledge to become a registered nurse. Counsel Licton, your time is up. Yes, I can hear you good. Okay. Well, your time is up and you'll have time and reply. Are there any, are there any questions, however, from the bench before, before that? No. Okay. Very good. You'll have time and reply counsel. Thank you. Your counsel is a jar. Yes, judge. Okay. Counsel, you may respond. Thank you, your honor. May it please the court. Good morning. Counsel. My name is Chris Jarko. I represent the Apple, uh, North shore university health system in this matter. Um, your honors, this claim, um, involves three primary issues and one minor issue. Um, the first three primary issues are whether the commission's decision regarding vocational rehabilitation, temporary partial disability or maintenance benefits and medical bills was against the manifest way to the evidence. We would submit that the commission's decision on these issues should be affirmed because they're supported by ample evidence and an opposite conclusion is not readily apparent. The, the secondary issue involves whether the commission's, um, admission of the deposition transcript of, uh, Mr. Ed Stefan was an abuse of discretion. Uh, we submit that the commission's admission of that, uh, deposition transcript was not abusive discretion, uh, because it cannot be that no reasonable, uh, person would have taken the same position as did the commission. Um, so adjusting the first point regarding the vocational rehabilitation, um, the commission's decision was supported by ample medical and vocational evidence to support his decision. Uh, vocational rehabilitation is due where an injury causes reduction in earning power and that there's evidence that the rehabilitation will increase that claim. It's earning capacity. The goal of rehabilitation is to reclaim, is to return the claimant to the workforce and not simply allow them to pick and choose a new career. Um, and then the findings of national T established that where a claimant already has sufficient skills for employment without new training, that factor weighs against the award of vocational rehabilitation. So we submit that there's no effort. We submit that the evidence supports that, uh, the, the claimant did not sustain a reduction in her earning power based on the medical evidence. We also submit that the vocational, uh, evidence shows that she could have, um, found suitable employment without additional training. Uh, so addressing the first point, the medical evidence, uh, the commission's decision is filled with, um, uh, support from three treating physicians. Uh, first is Dr. Stewart. Second is Dr. Dowling and third is Dr. Shapiro. All three of these physicians are the claim is treating, uh, physicians. So Dr. Stewart saw the claim at one time in September, 2005. In that one-time visit, he mentioned nothing about Patricia's ability to return to work and said nothing about whether she could return to work as a cancer researcher. He ordered, um, about a month of, about two weeks of physical therapy, after which there was a 14 month gap in treatment. Um, there was no follow-up until December of 2006. Um, she was taken off work from December 28, 06 through January 4 of 07, approximately one week. She then follows up with Dr. Dowling, um, after that 14 month gap in treatment. Dr. Dowling sees her in February 1st and February 21 of 07. Again, Dr. Dowling does not say anything about work restrictions whatsoever. In fact, she'd traded with Dr. Dowling on and off through 2013, um, approximately eight years, uh, since the date of this accident. And throughout all the records, Dr. Dowling says absolutely nothing about petitioner's ability to return to work. Um, he also makes absolutely no comments on whether or not the claimant can work as a cancer researcher. Um, so she follows up with Dowling in February of 07. There's then a two and a half year gap care, uh, until June of 09, where she sees Dowling for headaches. Doesn't say anything about work restrictions. There's then a four year gap in care when she follows up with Dowling in July of 13. Um, where again, he says nothing about work restrictions and also says nothing about causation, uh, dating back to the 2005 incident. And that brings us to her third physician, Dr. Shapiro, who was the, the, the spine physician. Um, so she sees Dr. Shapiro three times only, uh, only three times January 31 of 07, February 28 of 07 and March 28 of 07. During that period, he only authorizes her to one week of work restrictions for the period of, uh, February 7 07 through December 12th of 07. Um, at no point does he say these restricted, that there are any restrictions. And at no point does Dr. Shapiro ever say she cannot return to work as a cancer researcher. In fact, when the claimant returns to Dr. Shapiro in February of 07, he didn't declines any further treatment for her because she showed signs of improvement. And most importantly, his last visit with her in March of 07, that's March 28, 2007. She, she tells him that most of her symptoms had resolved. Petitioner never returned to treat with Dr. Shapiro. Dr. Shapiro never says she has permanent work restrictions and Dr. Shapiro is silent on whether or not the claimant can return to work as a cancer researcher. So these three physicians alone, I believe are enough to support the commission's decision that petitioner is cleared to work as a cancer researcher. There's no medical opinion other than Dr. Schmell that says that she can't, the commission relied on these three treating physicians to reject Dr. Schmell's opinions. And it's well within its purview as finder of fact to do that. Additionally, as I kind of alluded to, there's many multi-year gaps in care. So there's a, the first gap in care is from October 2005 through December of 2006. The second is February of 07 through June of 9, sorry, June of 09. And then the third is August of 09 through July of 13. So the commission could also look to all these gaps in care to show that her condition had been improving during this period and therefore support the commission's decision that there's no impairment of earnings, that no restrictions that preclude this claimant from returning to work as a cancer researcher. In addition to the medical evidence, the vocational evidence affirms the commission's decision entirely. So the claimant was evaluated by Ms. Ettenberg. Ms. Ettenberg confirmed that petitioner is well-trained, well-educated. She has two bachelor's degrees, one in food technology and nutrition, another in biology technology. She has a master's degree in biology and she has a doctorate degree in biology. This claimant was bilingual in English and Spanish. And at the time of the hearing, she was learning, I'm sorry, she's bilingual English and Polish and she was learning Spanish. She was intermediate level Spanish. Even Ms. Ettenberg said that this claimant did not require the typical skills needed by most vocational clients. Ms. Ettenberg admitted that the claimant had skills to find employment in a similarly situated career. Therefore, the commission found that the vocational rehabilitation was not necessary because she already had the skills needed. She could have pursued a career in pharmacy sales, which she never did. She could have looked for jobs as a cancer researcher with other employers, which she never did. She alleged that she applied to Abbott Labs and University of Chicago, but provided no further details about any other employers to which she inquired during the decade and a half in which this claim lingered. Furthermore, the commission was free to reject Ms. Ettenberg's opinions because she did not review all the medical records. She relied solely on the opinions of Dr. Schmill, which the commission rejected. And furthermore, Ms. Ettenberg said that this claimant could only earn $30,000 without any formal education. However, when you look at the record, that shows that in 2009, she earned $33,000 before pursuing more education. And it was not until 2010 when she began to see a decline in her earnings when she elected to pursue further higher education degrees, which most certainly would have impacted her earnings. So, based on the medical evidence and the vocational rehabilitation evidence, it's quite apparent that the commission's decision is supported by the manifest way of the evidence, and it should be affirmed. Moving on to the second issue regarding temporary partial disability. So, temporary partial disability is only owed until the claimant attains a state of maximum medical improvement. It's quite clear that the claimant attained maximum medical improvement in March of 2007 when she told Dr. Shapiro that her symptoms had resolved, that she ended her treatment at that point. Now, there's an argument to be made that the temporary partial disability should actually be considered Section 8A maintenance benefits. Now, maintenance benefits are only awarded where a claimant is precluded from her work because of the injury, and there's evidence that she was involved in a diligent job search. Neither of those are true in this case. As I argued previously, no treating physician opined that Petitia was precluded from returning to work. There's no evidence that Petitia pursued a diligent job search. Instead, she settled for low-paying jobs for which she was well overqualified. Now, counsel made an argument that the claimant was terminated in March of 2007. That's correct. However, there's no evidence that that termination was related to the injury. When I was reviewing the record, it dawned on me that Petitia was only off of work for a short period of time by her physicians. She was only authorized off work from December 28 of 06 through January 4 of 07, and again February 7 of 07 through December 12 of 07. This claimant was not terminated until well into March of 2007. Perhaps the termination was due to the fact that she was not coming to work, even though there was no physician ordering her off of work. Furthermore, Petitia's job is only to last approximately 23 months from June of 2005 through May of 2007. So, the fact that the claimant is not any longer employed by the respondent is a red herring, given that there is no guarantee of employment after May of 2007 anyways. Excuse me, counsel. I'm glad you addressed. That was one of my questions. I'm hearing you say that the record is not clear as to why she was terminated. Correct. I do have a follow-up question or another one, and that is why was her workstation not adjusted? You know, your honor, I'm not sure. So, that all came out in early 2007. I was not counsel of record at that time. The record isn't very clear as to why the workstation was not addressed. It didn't come out at hearing. I simply don't know the answer to that, unfortunately. So, I apologize. I don't have a better answer for you. Mr. Jerko, this might be a little bit off base, but you're saying that her postdoc was going to end in March of 2007. Is that right? So, the employment letter that was tendered to the claimant indicated that she was to begin working in mid-2005, and it was to end in May of 2007. So, she only had a few months left on her postdoc. Is that right? Correct. Yes. You know, just something about this case struck me as odd that here you have a highly educated person who has a Ph.D. It's from Poland. I'm assuming that it's of the same rigor and caliber as a Ph.D. from the United States or Western Europe, but and she's pursuing a postdoc, you know, one of the highest levels of education, and she was on the cusp of presumably entering industry or academia where she'd make a lot more money, right? And it just strikes me as odd that she was let go when she only had a couple months left in the fellowship. It may not bear on this case, but something about this case is very unusual. I agree, Your Honor. There's actually a lot of very bizarre aspects to this case, and I think that is certainly one of them. You know, as I was preparing my brief and preparing for today, that also crossed my mind, and I had thought to myself if she had just completed her postdoc, her program and held on for a few more months, things would have been a little bit easier for all of us here today, but I agree. I think it's very unusual, and you know, the reason behind her termination was never explained, so the claimant didn't really provide much information. The only information in the record that discusses the termination is the claimant's testimony regarding it, and the record shows there's only about two lines about it, and it just says that she had a telephone conversation with HR and the supervising professor, and she was let go. There was no explanation as to what was said during that conversation. There's no documentation, and so I agree. I think it's very unusual that we don't have more information regarding the circumstances of the termination. For the reasons stated previously, we believe the Commission's decision regarding medical bills should also be affirmed, essentially for the same reasons as established earlier, and unless your honors have any further questions, we would just ask that the Commission's decision be affirmed as it's consistent with the manifest way of the evidence, and an opposite conclusion is not clearly apparent in this situation. Any questions from the bench? Further questions? Okay, thank you, Counsel Jarkau. Mr. Licton, you may reply. Thank you, Justice Holbrook. Can you hear me? Yes, we can, yes. Okay, thank you. It's not the, as I pointed out in my reply brief, I don't think it's the burden should be on the petitioner to explain why the respondent terminated her when they didn't tell her why they terminated her. I think that the assumption has to be that the termination was due to the fact that she couldn't perform the duties that she was being, that were required of her to, in order to continue being a postdoc fellow. So, the assumption, I think, has to be that she was terminated for the reason that she couldn't do the job anymore, basically, and as to respondents claim that Dr., well, any of the doctors, but certainly Dr. Dowling didn't think she could do the job anymore. I mean, basically, he, as I said before, Dr. Dowling said, it looks like we've got to find, get the job modified ergonomically to see if that would be possible for her to do the job. And there was a person, as I mentioned before, Alice, who basically agreed with that. They wanted to see if they could change the job so that she could have a hood all to herself to see if that would help. And there was a mention that somebody named Ted Hogan is their ergonomic consultant at Northwestern, or was at that time, but she was terminated before that that individual ever got involved. So, the, I agree with Justice Taylor that it's kind of a, it's really a kind of a unique fact situation, but it shouldn't be, I mean, it's kind in my opinion, kind of a tragic kind of situation. You have somebody who gave their whole educational background to working at, you know, becoming a breast cancer researcher. And that career was cut short by the unfortunate situation of what she was being required to do physically, which injured her and we couldn't get, we couldn't get it or she couldn't get it changed. And so she eventually did the next best thing, which was to go into as far as she could tell was into nursing. She did look for other positions, other postdoc positions, as she testified. She looked into other possibly related fields, such as pharmaceutical sales. She couldn't find any employment there. She did the best she could. She, otherwise she was pretty much relegated to these kind of menial jobs where you could, the best hourly rate was like $15 an hour, which is, you know, basically about $30,000 a year as Ms. Entenberg, the vocational expert testified. So, it is a somewhat fact specific case, but the facts are not what the commission said they were. The facts are medically, according to the doctors, and these were the doctors at the Northwestern Health Service and Dr. Shapiro, who she was referred to that, you know, she couldn't do it anymore. And the, as far as I'm concerned, the respondents termination of her without giving her any reason, but her doctor, her supervisor, Dr. Luke, who was on the line when she got the call that she was terminated, was because she couldn't do the job physically anymore and they weren't willing to accommodate her, or maybe they might've been if they'd given more time, but they didn't. So, the facts are, they just decided goodbye. And, you know, so she was on her own to try to come up with something else, which she eventually did at great cost to herself. And at least she's, you know, somewhat useful to society as a registered nurse, working as a registered nurse. Mr. Licton, Mr. Licton, Mr. Licton, Mr. Licton, Mr. Licton, as a cancer, breast cancer research scientist. Hello, Mr. Licton, Mr. Licton, your time has expired. Yes, your honor. Your time has expired. Yes, your honor. Okay. Yes, I can hear you, Justice Holder. Oh, okay. I can hear you. Are there any questions from the bench? Apparently not. So, thank you, Mr. Licton. Thank you, Mr. Jarkau for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue. And at this time, the clerk of our court will escort you from our remote courtroom and we'll proceed to the next case.